1

2

3

4

5

6

7

8              **IN THE UNITED STATES DISTRICT COURT**

9              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   PARAMOUNT FARMS, INC.,                    CASE NO. CV F 08-1027 LJO SKO

12                    Plaintiff,              **SUMMARY JUDGMENT DECISION**
            vs.                               (Docs. 49, 50.)
13
     VENTILEX B.V.,
14
                     Defendant.
15   _____/

16                          <u>**INTRODUCTION**</u>

17        This action arises out of plaintiff Paramount Farms, Inc.'s ("Paramount Farms'") purchase of an

18   almond pasteurization system designed and manufactured by defendant Ventilex B.V. ("Ventilex BV").

19   Ventilex BV seeks summary judgment on Paramount Farms' breach of contract and warranty claims in

20   the absence of its privity with Paramount Farms or vicarious liability.  Paramount Farms seeks summary

21   judgment on its claims based on preclusive effects of an arbitration award in its favor against Ventilex

22   USA, Inc. ("Ventilex USA"), a United States-based subsidiary of Ventilex BV.  This Court considered

23   Paramount Farms and Ventilex BV's cross-summary judgment motions on the record[1] without a hearing,

24   _____

25        [1]        This Court carefully reviewed and considered all arguments, points and authorities, declarations, testimony,
     statements of undisputed facts and responses thereto, objections and other papers filed by the parties.  Omission of reference
26   to an argument, document, evidence, objection or paper is not to be construed to the effect that this Court did not consider
     the argument, document, evidence, objection or paper.  This Court thoroughly reviewed, considered and applied the evidence
27   it deemed admissible, material and appropriate for summary judgment/adjudication.  This Court does not rule on objections
     in a summary judgment/adjudication context.
28

                                    1

1   pursuant to Local Rule 230(g).  For the reasons discussed below, this Court DENIES Paramount Farms

2   summary judgment and GRANTS Ventilex BV summary adjudication on Paramount Farms' breach of

3   implied covenant of good faith and fair dealing claim and overhead and liquidated damages claims but

4   otherwise denies Ventilex BV summary judgment.

5                                               **The Parties**

6          Paramount Farms, a Delaware corporation, processes, produces and markets almonds and

7   pistachios and describes itself as "the world's largest vertically integrated supplier of pistachios and

8   almonds."  Paramount Farms performs almond processing at its facilities in Lost Hills, California.

9   Beginning in 2004, Paramount Farms initiated efforts to pasteurize almonds to achieve a "5-log"

10  reduction of Salmonella bacteria[2] which was expected to be imposed by federal and California almond

11  regulators.

12         Ventilex BV is a Dutch company and a manufacturer of nut pasteurization systems, including

13  the 11 THP Deluxe Ventilex Nut Pasteurization System ("Ventilex System"), which was designed and

14  largely manufactured by Ventilex BV.  Ventilex BV specializes in manufacturing industrial machinery,

15  particularly fluid bed drying equipment used in food, concrete and spice industries.

16         Ventilex USA is not a defendant in this action.  Ventilex USA is a Delaware corporation with

17  its principal place of business in Ohio.  Ventilex BV is Ventilex USA's sole shareholder.  Ventilex BV

18  notes that Ventilex USA was set up as a separate corporation "to serve the U.S. market independent of

19  Ventilex B.V." and manufacturers its own products and sells third-party products in addition to those

20  of Ventilex BV.  Ventilex BV points out that Ventilex USA's purpose is to gain a foothold in the United

21  States in that prior to Ventilex USA's creation, Ventilex BV sold its products to United States customers

22  directly or through contracted agents.

23                                          **Salmonella Reduction**

24         In 2004, after a salmonella outbreak, the Almond Board of California ("ABC") and Paramount

25  Farms investigated reduction of salmonella risk to almonds.  The ABC developed an action plan for

26  pasteurization of almonds sold in North America. The ABC created the Technical Expert Review Panel

27

28         [2]        "5-log" means to reduce the bacteria level by a factor of 100,000 or five zeros.

                                                    2

1   ("TERP") to review almond pasteurization technologies and to validate whether particular technology

2   was able to provide required salmonella reduction.  Paramount Farms attributes to Ventilex[3] repeated

3   guarantees "that its technology would obtain all necessary governmental approvals within a reasonable

4   period of time."

5        In summer 2004, Paramount Farms began discussions with Ventilex USA regarding potential

6   purchase of the Ventilex System.  Paramount Farms claims that it "refused to consider purchase of the

7   Ventilex system until it could 'prove' its technology by obtaining TERP approval of another of its

8   machines installed at California Nut (another almond processor)."  Paramount Farms further claims that

9   it communicated that it was interested to purchase the Ventilex System "to comply with current and

10   future governmental regulations."  Paramount Farms notes that on November 8, 2005, it decided to

11   purchase the Ventilex System after former Ventilex USA President Thomas Schroeder ("Mr.

12   Schroeder") informed Paramount Farms that "its machine at California Nut had obtained TERP

13   approval."

14   **Agreement To Purchase Ventilex System**

15        Paramount Farms entered into a November 9, 2005 three-page Proposal Contract ("Proposal

16   Contract") to purchase for more than $765,000 the Ventilex System.[4]  The Proposal Contract identifies

17   Paramount Farms as "Owner" and Ventilex USA as "Contractor" and is signed by Paramount Farms and

18   Ventilex USA,[5] the only parties listed in the Proposal Contract's notice provision.  The Proposal

19   Contract identifies no other party and identifies to "constitute the contract" between "Owner and

20   Contractor" several documents.  Such documents were assembled by Paramount Farms' Shawn

21   Tremaine ("Mr. Tremaine") and included: (1) Mr. Schroeder's November 8, 2005 letter ("November 8

22   letter") followed by four pages of specifications ("specifications") and a two-page addendum;[6] (2) the

23

24   _____

25   [3]   Paramount Farms merely refers to "Ventilex" and does not specify Ventilex BV, Ventilex USA, or both.

25   [4]   The Ventilex System comprised an almond pasteurizer, drier and cooler.

26

27   [5]   Ventilex BV contends that it is not a party to the Proposal Contract and did not sign it.

28   [6]   The addendum made changes to the quotation including a changed delivery point, a figure for installation costs, and other changes.

nine-page November 9, 2005 Paramount Farms Inc. Standard Conditions ("Paramount Standard Conditions"); and (3) the six-page Attachment No. 1 Paramount Farms Site/Safety/Environmental/Sanitation Rules and Regulations for Contractors ("Paramount Rules and Regulations"), created on January 11, 2000. Ventilex BV claims that Ventilex USA's four-page General Terms and Conditions of Sale – Revised January 2004 ("Ventilex USA General Terms and Conditions")[7] was included in the overall agreement.

The November 8 letter is entitled "Ventilex Pasteurization System" and references "VENTILEX USA Inc.," "VENTILEX B.V.," and "VENTILEX." The November 8 letter includes a signature for "Tom Schroeder President," with no entity specified.[8] The November 8 letter states in pertinent part:

> VENTILEX USA Inc. and VENTILEX B.V. hereby certifies [sic] that the equipment that we supply will be accepted by the FDA and USDA for the Pasteurization of Almonds. The installation will be repeatable, verifiable, and that data logging will take place, thus allowing for trace ability and long term storage of data.
>
> In addition, VENTILEX will work hand in hand with Paramount Farms to make sure that the "system" is accepted and "validated". VENTILEX guarantees the VENTILEX equipment will be validated and will correct any item found to deficient at our cost.
>
> VENTILEX appreciates your confidence in our company and our equipment, and we will work hard to meet your expectations.[9]

Page 4 of the specifications notes: "F.O.B.: VENTILEX B.V., Heerde, The Netherlands" and "Terms and Conditions: See Attached 'Terms and Conditions' Exhibit A Attached and made part of this proposal." Page 4 of the specifications further notes:

> VENTILEX appreciates your interest and will work diligently with Paramount Farms on this project. We appreciate your trust. We will not let you down.

---

[7]   The main text of the Ventilex USA General Terms and Conditions includes the heading "General Conditions for the Supply of Mechanical, Electrical and Electronic Products." Ventilex BV notes that the Ventilex USA General Terms and Conditions "are universally recognized terms and conditions of sale published by the European Engineering Industries Association."

[8]   In his declaration, Mr. Schroeder states that he executed the Proposal Contract "on behalf of Ventilex USA. I did not represent at any time that Ventilex B.V. would be a party to, or guarantor of, that Contract."

[9]   This Court will refer to the November 8 letter's three above paragraphs as the "approval guarantee." Paramount Farms claims that Ventilex BV drafted the approval guarantee. Mr. Schroeder recalls that an identical approval guarantee provided to Cal Nut was drafted by Ventilex BV. Paramount Farms notes that the same approval guarantee was provided for three Ventilex System sales in the United States.

4

Page 4 of the specifications includes a signature "Tom Schroeder Ventilex USA."  The last three pages of the specifications contain a footer noting "VENTILEX" and an Ohio address and telephone and fax numbers.

Page 5 of the Paramount Standard Conditions provides the following "Contractor's Guarantee":

(a) In addition to warranties, representations and guarantees stated elsewhere in the contract documents, the Contractor unconditionally guarantees and warrants that all **materials and workmanship** furnished hereunder shall be without defect and shall conform to the Plans and Specifications, and agrees to replace at its sole cost and expense, and to the satisfaction of the Owner, any and all materials which may be defective, improperly installed, or which do not conform to the plans and specifications. . . .

(b) The Contractor shall repair or replace to the satisfaction of the Owner any or all such work that may prove defective in **workmanship or materials**, which is improperly installed, or which does not conform to the plans and specifications, ordinary wear and tear expected, together with any other work which may be damaged or displaced in so doing.

(c) In the event of failure to comply with the above stated conditions within a reasonable time, the Owner is authorized to have the defect repaired or replaced at the expense of the Contractor who will pay the costs and charges therefore immediately upon demand, including any reasonable management and administrative costs, and engineering, legal and other consulting fees incurred to enforce with section.

(d) Except as otherwise provided in this Contract, the **guarantees and warranties shall remain in effect for one year after the completion of the project**.  (Bold added.)

Page 3 of the Proposal Contract contains a "Warranty" by which "The Contractor warrants that all the equipment covered by this quotation will be free of defects to workmanship and materials for a period of 12 months from start up.  Which is estimated to be: (1, March, 2006)."  (Underlining in original.)

The Ventilex USA General Terms and Conditions were not attached to the version of the Proposal Contract signed by the parties or to the other documents included with the Proposal Contract although Ventilex BV claims that all Ventilex Systems were to be resold by Ventilex USA subject to the Ventilex USA General Terms and Conditions as per the original sale.[10]  Ventilex BV acknowledges that the parties dispute whether the Proposal Contract includes the Ventilex USA General Terms and

---

[10]   Ventilex BV claims that Ventilex USA purchased the Ventilex System from Ventilex BV subject to the Ventilex USA General Terms and Conditions for resale to Paramount Farms.

5

Conditions.  Section 23 of the Ventilex USA General Terms and Conditions addresses "Liability For Defects" and states: "The Supplier's liability is limited to defects, which appear within a period of one year from delivery."  Section 33(b) of the Ventilex USA Terms and Conditions addresses failure to remedy defect and provide:

> [W]here the defect is so substantial as to significantly deprive the Purchaser of the benefit of the contract, the Purchaser may terminate the contract by notice in writing to the Supplier.  The Purchaser is then entitled to compensation for the loss he has suffered up to a maximum of 15 percent of the purchase price.

The Paramount Farms Standard Conditions include a provision to require arbitration of disputes.

Ventilex BV characterizes Mr. Tremaine as Paramount Farms' "point person" to negotiate the Proposal Contract and notes that Mr. Tremaine neither had discussions with anyone from Ventilex BV nor asked Ventilex BV to sign the Proposal Contract or to guarantee its terms.  In addition, Ventilex BV claims that it did not:

1.     Draft the Proposal Contract;

2.     Negotiate or communicate any of the terms between Ventilex USA and Paramount Farms; or

3.     Author the November 8 letter, authorize Ventilex USA to add Ventilex BV's name to the November 8 letter or intend to bind itself "to a contract it did not negotiate."

Ventilex BV points out that its former Managing Director Henk Dijkman ("Mr. Dijkman")[11] neither signed nor approved the Proposal Contract.  However, Paramount Farms notes that Mr. Schroeder sent a copy of the Proposal Contract and November 8 letter to Mr. Dijkman prior to signing of the Proposal Contract.

In his recent deposition, Mr. Dijkman testified as to governmental approval of the Ventilex System:

> Q.     . . . Did you learn at some point in those negotiations from Mr. Schroeder or other sources that Paramount wanted the same Guarantee from Ventilex B.V. and Ventilex, Inc. that was given to Cal Nut?
>
> A.     They want the T.E.R.P. approval.

---

[11]     Ventilex BV explains that under Dutch law, Mr. Dijkman "was essentially its chief executive officer or president."

6

1   Q.      And at some point, Paramount agreed to buy a Ventilex B.V. machine, right?

2   A.      That's right, yeah.

3   Q.      And was it your understanding that Ventilex B.V. and Ventilex, Inc. gave
            Paramount the guarantee this machine would get all necessary approvals?

4

5   A.      Yes.

6           . . .

7   Q.      And did you hope and understand that this guarantee was conveyed to Paramount
            Farms?
            . . .

8

9   THE DEPONENT: Yes.  I want to make one comment.  At that time we had approval
    from Cal Nut.  So for us it was an indication it was no issue to give the guarantee for the
    log 5 killing and it should be somewhere in the document between Inc.[12] and B.V.

10

11  Q.      So to make the sale, Ventilex B.V. and Ventilex, Inc. guaranteed Paramount that
            the Machine it was buying would get the necessary T.E.R.P. approval?

12  A.      Yes.

13  Mr. Dijkman further testified that he understood that Paramount Farms relied on guarantees from

14  Ventilex BV and Ventilex USA to decide to purchase the Ventilex System.

15                          **The Ventilex System's Operation**

16          Ventilex BV notes that it constructed, tested and packed for shipment Ventilex System for

17  Ventilex USA's further handling, installation and startup upon the Ventilex System's arrival in the

18  United States.  Ventilex BV disclaims "further responsibility or control of the installation and testing

19  of the Ventilex System."  Paramount Farms characterizes Ventilex USA as "simply" a seller of the

20  Ventilex System in that Ventilex USA required a quotation from Ventilex BV and issued a purchase

21  order to Ventilex BV.

22          After the March 6, 2006 delivery of the Ventilex System to Paramount Farms, Ventilex BV

23  claims that Ventilex USA installed the Ventilex System's process units.  Paramount Farms notes that

24  Trecom, a Ventilex BV subcontractor, installed the Ventilex System at Paramount Farms and performs

25  commissioning and start ups of Ventilex BV products.  Ventilex BV acknowledges that as the

26  manufacture of Ventilex System software, Trecom "routinely commissions startup" but claims that

27

28          [12]      Mr. Dijkman referred to Ventilex USA as "Inc."

                                              7

1   Ventilex USA retained Trecom to install the Ventilex System at Paramount Farms and paid Trecom's

2   bill.  Paramount Farms points to Mr. Dijkman's deposition testimony:

3       Q.   In this time period, 2001 to 2005, when Ventilex, Inc. made a sale of Ventilex
             B.V. machine, who was responsible for the startup of that machine for the U.S.
4            customer?

5       A.   We were.

6
        Q.   And "we," meaning Ventilex B.V.?
7
        A.   B.V., yes.
8
        Q.   And Ventilex B.V. designed and manufactured those machines?
9
        A.   That's right.
10
        Q.   Okay.  In fact, didn't the machines even have a Ventilex B.V. kind of name plate
11           on them?

12      A.   That's right.

13          According to Ventilex BV, the Ventilex System was fully operational no later than June 29, 2006

14   and Paramount Farms operated the Ventilex System "without Complaint for more than a year."  Ventilex

15   BV claims that it was unaware of issues with the Ventilex System until September 2007 when Ventilex

16   USA alerted that Paramount Farms' Ventilex System "had failed validation testing and that Paramount

17   was having an issue with its process authority to obtain TERP validation."  Paramount Farms points to

18   Mr. Schroeder's November 3, 2007 and December 18, 2007 emails that "we have failed" to suggest that

19   Ventilex BV and/or Ventilex USA "could not deliver on the guarantee of governmental approval despite

20   extensive efforts" of the parties.

21          Paramount Farms notes that its Ventilex System did not meet the regulatory "drop dead date"

22   of June 1, 2008 for having a TERP-approved almond pasteurization system in place to prevent its United

23   States almond sales.  As such, in April 2008, Paramount Farms stopped using the Ventilex System, sent

24   its almonds for outside pasteurization, and decided to purchase a pasteurization system produced by

25   FMC Food Tech., Inc. ("FMC System").  Paramount Farms entered into a May 2008 contract to purchase

26   the FMC System.

27                              **Paramount Farms' Arbitration Demand**

28          In early June 2008, Paramount Farms filed an arbitration demand with the American Arbitration

8

1   Association ("AAA") against Ventilex BV and Ventilex USA.  Paramount Farms notes that the

2   arbitration demand included claims for breach of contract and breach of warranty of the Proposal

3   Contract and its "primary basis . . . was failure of the pasteurization machine to obtain required

4   government approval as provided and promised in the express performance guarantee/warranty by both

5   Ventilex USA and BV."  Ventilex BV submitted to AAA its June 25, 2008 objection to participate in

6   arbitration in that it "never executed and was never a party to any arbitration agreement with Paramount

7   to resolve disputes."  Ventilex BV sought to stay the arbitration in New York state court on grounds that

8   it is not a party to the Proposal Contract and incorporated documents.  In late June 2008, Paramount

9   Farms removed the state action to a New York federal court but on July 18, 2008, filed this action

10  against Ventilex BV in this Court to allege what Paramount Farms characterizes as the "same claims"

11  asserted against Ventilex USA in the arbitration.  In October 2008, Paramount Farms withdrew its

12  claims against Ventilex BV in the arbitration to render this action as the sole forum for Paramount

13  Farms' claims against Ventilex BV.

14                          **Paramount Farms' Claims Against Ventilex BV**

15          Paramount Farms' operative original complaint ("complaint"), filed on July 18, 2008, alleges

16  that "Ventilex did not or could not address the fundamental design flaws of the System that prevented

17  it from achieving the required results and being validated and approved."   The complaint further alleges

18  that since August 15, 2007, Paramount Farms' Ventilex System "has been tested by TERP for validation

19  at least four times," "has failed to perform as warranted," and has failed to "achieve a 5-log reduction

20  in Salmonella bacteria" or "even a 4-log reduction" to force Paramount Farms to pasteurize its almonds

21  offsite at a cost of $68,000 per week since April 14, 2008 and to purchase a replacement pasteurization

22  system in excess of $1 million.

23          As to specific claims against Ventilex BV, the complaint alleges:

24  1.          A (first) breach of written contract claim that "Ventilex breached the written Contract"[13]

25              and a (second) breach of express warranty claim that "Ventilex has breached the express

26  _____

27  [13]        The complaint defines "Ventilex" as "Ventilex B.V. and each of the fictitiously named Doe defendants."
    The complaint states: "Ventilex USA is not a party to this action."  The complaint appears to refer to "Contract" as the
28  Proposal Contract and documents which it incorporates.

warranty contained in the Contract" in that:

      a.     The Ventilex System "has not been validated or approved by any governmental agency for almond pasteurization";

      b.     Ventilex has failed to work with Paramount Farms to ensure that the system is approved or validated;

      c.     The materials and workmanship were defective and failed to perform to plans and specifications; and

      d.     Ventilex failed to repair or replace to Paramount Farms' satisfaction the defective workmanship or materials within a reasonable time;

2.     A (third) breach of implied covenant of good faith and fair dealing claim that "Ventilex" has failed to provide contracted materials, workmanship and services and has failed promptly to remedy defective and nonconforming materials, workmanship and services;

3.     A (fourth) breach of implied warranty of merchantability claim that the system's failure to achieve 5-log Salmonella bacteria reduction renders the system "not fit for the purpose in which such goods are generally used"; and

4.     A (fifth) breach of implied warranty of fitness for particular purpose claim that the "goods provided to [Paramount Farms] by Ventilex were not suitable for [Paramount Farms'] particular needs" in the absence of a 4-log or 5-log Salmonella bacteria reduction.

The complaint alleges damages in excess of $5 million.

### Arbitration Of Paramount Farms' Claims Against Ventilex USA

During August to December 2009, twelve days were devoted to arbitrate Paramount Farms' claims against Ventilex USA before a panel of three AAA arbitrators who issued a February 26, 2010 unanimous decision ("arbitration decision") to award $4,989,387 to Paramount Farms on its breach of contract and warranty claims. Paramount Farms notes that the arbitration resolved issues before this Court, including:

1.     Interpretation of "contract," "performance guarantee/warranty," and "applicable warranty provisions";

1    2.    "[W]hether Ventilex's[14] terms and conditions were part of the contract";

2    3.    "[W]hether Ventilex breached the contract and/or any guarantees/warranties";

3    4.    "[W]hether Paramount failed to act within the warranty period";

4    5.    "[W]hether Paramount waived any claims";

5    6.    "[W]hether Paramount was in anyway responsible for any of its damages";

6    7.    "[W]hether Paramount's purchase of a replacement system was proper";

7    8.    The "amount of damages owed to Paramount"; and

8    9.    "[W]hether Paramount was entitled to liquidated damages, overhead costs, or attorneys'

9          fees."

10   According to Paramount Farms, this action against Ventilex BV "involves the same contract, same

11   pasteurization system, same purchaser, same manufacturer, same underlying facts, same principal

12   witnesses and same claims of breach of contract and breach of warranty (and related claims) as the

13   previous arbitration" between Paramount Farms and Ventilex USA.  Ventilex BV notes that the

14   arbitration decision made no finding regarding it.

15        With its May 28, 2010 ruling, the Los Angeles County Superior Court granted Paramount Farms'

16   petition to confirm the arbitration award in Paramount Farms' favor.  A $5,010,432.98 judgment in

17   Paramount Farms as entered on June 29, 2010 in Los Angeles County Superior Court.  On July 2, 2010,

18   Ventilex USA filed a notice of appeal of the judgment.

19                          **SUMMARY JUDGMENT STANDARDS**

20        To support summary judgment in its favor, Paramount Farms contends that its favorable

21   arbitration decision entitles it to res judicata (claim preclusion) and collateral estoppel (issue preclusion)

22   on its breach of contract and warranty claims given Ventilex BV's "direct liability" under the approval

23   guarantee which Ventilex BV provided Paramount Farms.  Paramount Farms further contends that

24   Ventilex BV is bound to the arbitration decision under agency principles "whereby a parent is held liable

25   for its subsidiary's acts if the subsidiary is just an 'extension' or mere 'selling/marketing arm' or the

26   parent."  In addition, Paramount Farms advocates that Ventilex BV is directly liable under the approval

27

28        [14]   This Court is unsure whether Paramount Farms' use of "Ventilex" refers to Ventilex BV, Ventilex USA
     or both.

                                      11

1  guarantee in that Ventilex BV provided or ratified the approval guarantee and the Ventilex System failed

2  to obtain governmental approvals as warranted.

3       Ventilex BV seeks summary judgment on Paramount Farms' claims based on its absence of

4  privity with Paramount Farms.  Ventilex BV further contends that Paramount Farms' claims are barred

5  by warranty time limits.  Ventilex BV further seeks summary judgment on Paramount Farms' overhead

6  and liquidated damages claims as unsupported by fact or law.

7       F.R.Civ.P. 56(a) permits a "party claiming relief" to seek "summary judgment on all or part of

8  the claim."  F.R.Civ.P. 56(b) permits a "party against whom relief is sought" to seek "summary

9  judgment on all or part of the claim."  "A district court may dispose of a particular claim or defense by

10  summary judgment when one of the parties is entitled to judgment as a matter of law on that claim or

11  defense." *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st Cir. 1999).

12       Summary judgment is appropriate when there exists no genuine issue as to any material fact and

13  the moving party is entitled to judgment as a matter of law.  F.R.Civ.P. 56(c)(2); *Matsushita Elec. Indus.*

14  *v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific*

15  *Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The purpose of summary judgment is to

16  "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial."

17  *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin*

18  *Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

19       On summary judgment, a court must decide whether there is a "genuine issue as to any material

20  fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56(c)(2); *Covey*

21  *v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*,

22  398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82

23  S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir.

24  1984).  The evidence of the party opposing summary judgment is to be believed and all reasonable

25  inferences that may be drawn from the facts before the court must be drawn in favor of the opposing

26  party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S.

27  at 587, 106 S.Ct. 1348.  The inquiry is "whether the evidence presents a sufficient disagreement to

28  require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

1     *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

2         To carry its burden of production on summary judgment, a moving party "must either produce

3 evidence negating an essential element of the nonmoving party's claim or defense or show that the

4 nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of

5 persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th

6 Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir.

7 1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the

8 court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech*

9 *Gays*, 895 F.2d at 574. "As to materiality, the substantive law will identify which facts are material.

10 Only disputes over facts that might affect the outcome of the suit under the governing law will properly

11 preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

12         "If a moving party fails to carry its initial burden of production, the nonmoving party has no

13 obligation to produce anything, even if the nonmoving party would have the ultimate burden of

14 persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598.

15 "If, however, a moving party carries its burden of production, the nonmoving party must produce

16 evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d

17 at 574. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material

18 fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see*

19 *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56(c) mandates the entry of

20 summary judgment, after adequate time for discovery and upon motion, against a party who fails to make

21 the showing sufficient to establish the existence of an element essential to that party's case, and on

22 which that party will bear the burden of proof at trial.")

23         "But if the nonmoving party produces enough evidence to create a genuine issue of material fact,

24 the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322,

25 106 S.Ct. 2548. "The amount of evidence necessary to raise a genuine issue of material fact is enough

26 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp.*

27 *v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-

28 289, 88 S.Ct. 1575, 1592 (1968)). "The mere existence of a scintilla of evidence in support of the

1    plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

2          Under F.R.Civ.P. 56(d)(2), a summary judgment/adjudication motion, interlocutory in character,

3    may be rendered on the issue of liability alone.  "In cases that involve . . . multiple causes of action,

4    summary judgment may be proper as to some causes of action but not as to others, or as to some issues

5    but not as to others, or as to some parties, but not as to others." *Barker v. Norman*, 651 F.2d 1107, 1123

6    (5th Cir. 1981); *see also Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir. 1990); *Cheng v.*

7    *Commissioner Internal Revenue Service*, 878 F.2d 306, 309 (9th Cir. 1989).  A court "may grant

8    summary adjudication as to specific issues if it will narrow the issues for trial." *First Nat'l Ins. Co. v.*

9    *F.D.I.C.*, 977 F.Supp. 1051, 1055 (S.D. Cal. 1977).

10         As discussed below, factual issues preclude summary judgment for the parties, except for

11   Ventilex BV on Paramount Farms' breach of implied covenant of good faith and fair dealing claim and

12   overhead and liquidated damages claims.

13                    **PARAMOUNT FARMS' SUMMARY JUDGMENT MOTION**

14         Paramount Farms seeks summary judgment on grounds that:

15         1.    The arbitration decision entitles it to res judicata/collateral estoppel against Ventilex BV

16               as to Paramount Farms' claims;

17         2.    Ventilex USA acted as Ventilex BV's agent to bind Ventilex BV to the approval

18               guarantee; and

19         3.    Ventilex BV is directly liable under the approval guarantee.

20                    **Res Judicata/Collateral Estoppel Elements**

21         Paramount Farms seeks to apply against Ventilex BV the "preclusive effects" of the arbitration

22   decision in that this Court's only legal determination is whether Ventilex BV and Ventilex USA "were

23   in privity for purposes" of the Proposal Contract.  Paramount Farms characterizes the arbitration as "a

24   near replica of the current case" to entitle Paramount Farms to res judicata and collateral estoppel effects

25   of the arbitration decision.[15]

26         Ventilex BV responds that the arbitration addressed only issues between Paramount Farms and

27   _____

28         [15]   Paramount Farms does not distinguish res judicata and collateral estoppel and appears to seek to apply both
     doctrines.

                                            14

1   Ventilex USA and did not address issues relative to Ventilex BV.

2                                    ***Res Judicata***

3          "To determine the preclusive effect of a state court judgment, federal courts look to state law."

4   *Intri-Plex Technologies, Inc. v. The Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007).

5          "Res judicata" is "the preclusive effect of a final judgment on the merits.  Res judicata, or claim

6   preclusion, prevents relitigation of the same cause of action in a second suit between the same parties

7   or parties in privity with them."  *Mycogen Corp. v. Monsanto Co.*, 28 Cal.4th 888, 896-897, 123

8   Cal.Rptr.2d 432 (2002).  Res judicata "precludes parties or their privies from relitigating a cause of

9   action that has been finally determined by a court of competent jurisdiction."  *Rice v. Crow*, 81

10  Cal.App.4th 725, 734, 97 Cal.Rptr.2d 110 (2000) (dismissal of a California superior court complaint

11  with prejudice is a final judgment on merits).

12         Res judicata serves "the dual purpose of protecting litigants from the burden of relitigating an

13  identical issue with the same party or his privy and of promoting judicial economy by preventing

14  needless litigation."  *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645 (1979).  Res

15  judicata "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources,

16  and, by preventing inconsistent decisions, encourage[s] reliance on adjudication."  *Allen v. McCurry*,

17  449 U.S. 90, 94, 101 S.Ct. 411 (1980).

18         The U.S. Supreme Court has further explained the "general rule of res judicata":

19         The general rule of res judicata applies to repetitious suits involving the same cause of
           action. It rests upon considerations of economy of judicial time and public policy
20         favoring the establishment of certainty in legal relations. The rule provides that when a
           court of competent jurisdiction has entered a final judgment on the merits of a cause of
21         action, the parties to the suit and their privies are thereafter bound 'not only as to every
           matter which was offered and received to sustain or defeat the claim or demand, but as
22         to any other admissible matter which might have been offered for that purpose.' . . . The
           judgment puts an end to the cause of action, which cannot again be brought into litigation
23         between the parties upon any ground whatever, absent fraud or some other factor
           invalidating the judgment.

24

25  *C.I.R. v. Sunnen*, 333 U.S. 591, 597, 68 S.Ct. 715 (1948) (citation omitted).

26         The "prerequisite elements" to apply the res judicata doctrine to an entire cause of action or one

27  or more issues are: "(1) A claim or issue raised in the present action is identical to a claim or issue

28  litigated in a prior proceeding; (2) the prior proceeding resulted in a final judgment on the merits; and

(3) the party against whom the doctrine is being asserted was a party or in privity with a party to the prior proceeding." *People v. Barragan*, 32 Cal.4th 236, 253,  9 Cal.Rptr.3d 76 (2004) (quoting *Brinton v. Bankers Pension Services, Inc.,* 76 Cal.App.4th 550, 556, 90 Cal.Rptr.2d 469 (1999)).

### Collateral Estoppel

Like res judicata, "[c]ollateral estoppel precludes relitigation of issues argued in prior proceedings." *Lucido v. Superior Court*, 51 Cal.3d 335, 341, 272 Cal.Rptr. 767, 769 (1990), *cert. denied*, 500 U.S. 920, 111 S.Ct. 2021 (1990).  "A party's ability to relitigate an issue decided in a prior state court determination depends on the law of the state in which the earlier litigation occurred." *Kinslow v. Ratzlaff*, 158 F.3d 1104, 1105 (10th Cir. 1998).

Threshold requirements to apply collateral estoppel are:

1.      The issue sought to be precluded from relitigation must be **identical** to that decided in a former proceeding;

2.      The issue must have been **actually litigated** in the former proceeding;

3.      The issue must have been **necessarily decided** in the former proceeding;

4.      The decision in the former proceeding must be **final and on the merits**; and

5.      The party against whom preclusion is sought must be the **same as, or in privity with**, the party to the former proceeding.

*Lucido*, 51 Cal.3d at 341, 272 Cal.Rptr.2d at 769.

Paramount Farms explains that collateral estoppel applies if "(1) the issues decided in the arbitration are the same as those at issue here; (2) the previous award was the final determination by the arbitrators; and (3) Ventilex USA and Ventilex BV were in privity."

### Identical Issues

"The application of the doctrine of collateral estoppel depends on whether the *issue* in both actions is the same, not whether the issue arises in the same *context*." *First N.B.S. Corp. v. Gabrielsen*, 179 Cal.App.3d 1189, 1195-1196, 225 Cal.Rptr. 254, 257 (1986) (italics in original).  "[O]nly issues actually litigated in the initial action may be precluded from the second proceeding under the collateral estoppel doctrine. . . . An issue is actually litigated '[w]hen [it] is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined.'" *Gottlieb v. Kest*, 141 Cal.App.4th

1    110, 148, 46 Cal.Rptr.3d 7 (2006) (citations omitted).

2           Paramount Farms argues that the arbitration decision addressed the "same" issues involved in

3    this action – "the exact same contract, same failed pasteurization system, same purchaser, same

4    manufacturer, same facts, and same claims of breach of contract and breach of warranty (and related

5    claims) based on the same actions by the parties involved." Paramount Farms characterizes the approval

6    guarantee as the "lynchpin of this case."

7           Ventilex BV argues that the legal liability issues presented in the arbitration and this action are

8    "completely different" despite whether Paramount Farms' claims in this action "arise out of the same

9    basic transaction."   Ventilex BV notes that the arbitration did not address negotiations and

10   communications between Paramount Farms and Ventilex BV, Ventilex BV's agreement with Ventilex

11   USA to sell the Ventilex System, Ventilex BV and Ventilex USA's respective responsibilities regarding

12   the sale, Ventilex BV and Ventilex USA's relationship, and Ventilex BV's involvement in the sale of

13   the Ventilex System to Paramount Farms.

14          As to liability, the arbitration decision determined that:

15   1.     Ventilex USA "warranted that it would provide a pasteurization system that would 'be

16          accepted by the FDA and USDA for pasteurization of Almonds'";

17   2.     Ventilex USA promised that it would "work hand in hand with Paramount Farms to

18          make sure that the 'system' is accepted and 'validated'";

19   3.     Ventilex USA guaranteed that it would "correct any item found to be deficient at our

20          cost";

21   4.     The Ventilex System provided to Paramount Farms never received "necessary approval";

22   5.     The "warranty provision at issue pertains to achieving the necessary approvals for the

23          pasteurization system," including working "hand in hand" with Paramount Farms "to

24          make sure the system is accepted and validated";

25   6.     "Achieving approval was the *sine qua non* of the parties' bargain";

26   7.     "Ventilex breached its warranty to provide a pasteurization system that would obtain

27          necessary approvals and that it would work with Paramount at its expense to correct the

28          machine so it could obtain approval";

17

8.    "The machine did not achieve the approval, and the level of service provided was not calculated to actually make the changes necessary to achieve approval"; and

9.    Ventilex USA is not liable for breach of the implied covenant of good faith and fair dealing.

For damages, the arbitration decision awarded Paramount Farms $2,667,327 for direct additional costs, comprising Ventilex System installation costs and the purchase price of Ventilex System plus the cost above that for the FMC System[16] less the price of the Ventilex BV cooler and drier which Paramount Farms retained.  The arbitration decision also awarded Paramount Farms $2,200,368 for outside pasteurization costs plus pre-award interest of $121,692 for a total award of $4,989,387.  The arbitration decision rejected Paramount Farms' claims for: (1) $2,565,000 overhead costs arising from Paramount Farms' management efforts to address the Ventilex System; and (2) $5.42 million in liquidated damages which Paramount Farms sought under a provision addressing delay to deliver the Ventilex System.

The arbitration decision addresses overlapping issues involved here but since parent corporation Ventilex BV is the defendant here, this Court is not prepared to characterize the issues in the arbitration and this action as identical or the same in that the only issues pertaining to Ventilex USA were actually litigated in the arbitration.  Although the issues in the arbitration arose within the context of the issues here, Ventilex BV points to sufficient distinctions among the issues to raise no less than factual issues whether res judicata or collateral estoppel applies to the arbitration decision.  The arbitration decision addressed precise issues as to Ventilex USA, not Ventilex BV whose liability and role differ from those of Ventilex USA.  A further problem is that Paramount Farms fails to define or identify which claims or issues are subject to res judicata or collateral estoppel effects.  Paramount Farms appears to seek to insert Ventilex BV in the arbitration decision in place of Ventilex USA.  Paramount Farms fails to demonstrate its ability to do so.

### Final Decision On Merits

Paramount Farms notes that arbitration awards are final to subject them to res judicata and

---

[16]   The arbitration panel specifically found that Paramount Farms "had no viable alternative to replacing the Ventilex pasteurizer with the FMC pasteurizer and such replacement was necessary to mitigate Paramount's damages."

collateral estoppel effects.

To be a final determination for collateral estoppel purposes, a determination need not be a final judgment but "sufficiently firm to be accorded conclusive effect." *Luben Industries, Inc. v. United States*, 707 F.2d 1037, 1040 (9th Cir. 1983). California Code of Civil Procedure section 1287.4 addresses a judgment confirming an arbitration award and provides:

> If an award is confirmed, judgment shall be entered in conformity therewith. The judgment so entered has the same force and effect as, and is subject to all the provisions of law relating to, a judgment in a civil action of the same jurisdictional classification; and it may be enforced like any other judgment of the court in which it is entered, in an action of the same jurisdictional classification.

"Once a valid award is made by the arbitrator, it is conclusive on matters of fact and law and all matters in the award are thereafter res judicata." *Lehto v. Underground Constr. Co.*, 69 Cal.App.3d 933, 939, 138 Cal.Rptr. 419 (1977). "[E]very presumption favors the arbitrator's award, and the merits of the award, either on question of law or fact, are generally not subject to review." *Lehto*, 69 Cal.App.3d at 939, 138 Cal.Rptr. 419. Quoting from a treatise, the California Court of Appeal has likewise explained:

> Once a valid award is made, with the submission upon which it is founded it becomes the sole basis for any further determination of the rights of the parties with respect to any demands embraced in the submission, and the latter are merged and extinguished in the award. The award is conclusive on matters of fact and law, and all matters in the award are thereafter res judicata, on the theory that the matter has been adjudged by a tribunal which the parties have agreed to make final, a tribunal of last resort for that controversy.

*Thibodeau v. Crum,* 4 Cal.App.4th 749, 759, 6 Cal.Rptr.2d 27 (1976) (quoting 6 Cal.Jur.3d, Arbitration and Award, § 41, p. 72.)

There is no doubt that the arbitration decision is a final decision on the merits as to Paramount Farms and Ventilex USA who agreed to arbitrate their disputes. However, Ventilex BV raises a valid point whether it is bound to the arbitration decision as a third party.

In *Vandenberg v. Superior Court*, 21 Cal.4th 815, 836-837, 88 Cal.Rptr.2d 366 (1999), the California Supreme Court adopted "for California purposes, the rule that a private arbitration award cannot have nonmutual collateral estoppel effect unless the arbitral parties so agree." The California Supreme Court explained:

> We therefore face a situation in which the policies underlying the doctrine of collateral estoppel must yield to the contractual basis of private arbitration, i.e., the principle that the scope and effect of the arbitration are for the parties themselves to

1

2

decide. Accordingly, we are compelled to conclude that a private arbitration award, even if judicially confirmed, can have no collateral estoppel effect in favor of third persons unless the arbitral parties agreed, in the particular case, that such a consequence should apply.

3

4

*Vandenberg*, 21 Cal.4th at 833-834, 88 Cal.Rptr.2d 366.

5

Paramount Farm's commencement of this action after dismissing Ventilex BV from arbitration

6

demonstrates the absence of agreement to subject Ventilex BV to collateral estoppel effects of the

7

arbitration.  Ventilex BV correctly notes that to oppose its motion to dismiss, Paramount Farms took a

8

position as to the effects of arbitration on Ventilex BV which contradicts the stance it advocates to

9

support summary judgment.[17]  There is no evidence that Paramount Farms and Ventilex USA agreed that

10

Ventilex BV would be bound by the arbitration decision.  Paramount Farms fails to satisfy the final

11

decision on merits element as to Ventilex BV.

12

### Same Parties Or Privity

13

Paramount Farms argues that Ventilex BV and Ventilex USA are in privity for purposes of res

14

judicata and collateral estoppel.  Ventilex BV responds that "there is no privity as a matter of fact and

15

law between Ventilex USA and Ventilex B.V. with respect to the arbitration or the underlying

16

transaction."

17

Privity refers to "a relationship between the party to be estopped and the unsuccessful party in

18

the prior litigation which is 'sufficiently close' so as to justify application of the doctrine of collateral

19

estoppel."  *Clemmer v. Hartford Ins. Co.*, 22 Cal.3d 865, 875, 151 Cal.Rptr. 285 (1978).  The California

20

Supreme Court has explained:

21

22

23

24

25

In the context of collateral estoppel, due process requires that the party to be estopped must have had an identity or community of interest with, an adequate representation by, the losing party in the first action as well as the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication.  Thus, in deciding whether to apply collateral estoppel, the court must balance the rights of the party to be estopped against the need for applying collateral estoppel in the particular case, in order to promote judicial economy by minimizing repetitive litigation, to prevent inconsistent judgments which undermine the integrity of the judicial system, or to protect against vexatious litigation.

26

27

28

[17]     Ventilex BV explains: "By reversing its position on issue preclusion, Paramount is seeking to have it both ways – first rejecting the doctrine so as to maintain a separate action and pursue allegedly independent claims against Ventilex B.V., and later asserting the doctrine affirmatively to prevent Ventilex B.V. from defending itself in that same action."

1   *Clemmer*, 22 Cal.3d at 875, 151 Cal.Rptr. 285 (citations omitted).

2       To address privity, "courts examine the practicalities of the situation and attempt to determine

3   whether plaintiffs are 'sufficiently close to the original case to afford application of the principle of

4   preclusion.'" *Armstrong v. Armstrong*, 15 Cal.3d 942, 951, 126 Cal.Rptr. 805 (1976) (quoting *People*

5   *ex rel. State of Cal. v. Drinkhouse,* 4 Cal.App.3d 931, 937, 84 Cal.Rptr. 773 (1970)). Privity exists when

6   the person involved is "so identified in interest with another that he represents the same legal right."

7   *Zaragosa v. Craven,* 33 Cal.2d 315, 318, 202 P.2d 73 (1949).

8       Nonetheless, "collateral estoppel may be applied only if the requirements of due process are

9   met." *Lynch v. Glass*, 44 Cal.App.3d 943, 948, 119 Cal.Rptr. 139 (1975). "Due process requires that

10  the nonparty have had an identity or community of interest with, and adequate representation by, the

11  losing party in the first action." *Lynch*, 44 Cal.App.3d at 948, 119 Cal.Rptr. 139. "The circumstances

12  must also have been such that the nonparty should reasonably have expected to be bound by the prior

13  adjudication." *Lynch*, 44 Cal.App.3d at 948, 119 Cal.Rptr. 139. "A nonparty should reasonably be

14  expected to be bound if he had in reality contested the prior action even if he did not make a formal

15  appearance. Thus, collateral estoppel has been applied against nonparties who had a proprietary or

16  financial interest in and control of, a prior action." *Lynch*, 44 Cal.App.3d at 949, 119 Cal.Rptr. 139.

17  Collateral estoppel further applies when the nonparty has such an interest "in the determination of a

18  question of fact or law with reference to the same subject matter or transaction." *Stafford v. Russell*, 117

19  Cal.App.2d 319, 320, 255 P.2d 872 (1953), *cert. denied*, 346 U.S. 926, 74 S.Ct. 315 (1954).

20                          Identity Of Interest/Adequate Representation

21      Paramount Farms argues that Ventilex BV and Ventilex USA are "sufficiently close" and share

22  a "community of interest" in that:

23      1.   Ventilex USA was created to serve as a sales and marketing office for Ventilex BV

24           products in the United States;

25      2.   Ventilex USA sold the Ventilex System designed and manufactured by Ventilex BV;

26      3.   The Ventilex System was installed at Paramount Farms by Trecom, which performed

27           commissioning and start ups for most Ventilex BV machines;

28      4.   Ventilex BV and Ventilex USA were referred to interchangeably;

                                            21

5.      To make a sale, Ventilex USA required a prior quote from Ventilex BV, which dictated price and specifications;

6.      Ventilex USA's Mr. Schroeder sent a copy of the Proposal Contract to Ventilex BV's Mr. Dijkman;

7.      The November 8 letter states that "VENTILEX USA Inc. and VENTILEX B.V. hereby certifies [sic] that the equipment that we supply will be accepted by the FDA and USDA for the Pasteurization of Almonds";

8.      Mr. Dijkman was aware that Paramount Farms required the approval guarantee from Ventilex BV and Ventilex USA and that Mr. Schroeder provided the approval guarantee; and

9.      Neither Ventilex BV nor Mr. Dijkman disclaimed the approval guarantee.

As such, Paramount Farms argues that Ventilex BV knew that the approval guarantee was in the names of Ventilex BV and Ventilex USA and that Paramount Farms "was relying on it" to the effect that Ventilex BV "approved or otherwise ratified Ventilex BV's inclusion and backing of the performance guarantee."

Paramount Farms further contends that Ventilex USA adequately represented Ventilex BV's interests in the arbitration given the similarity of claims against Ventilex USA in the arbitration and those against Ventilex BV here.  "[D]ue process requires both that the prior litigation of the issue have been motivated by the same underlying purposes, and that the original party have had an incentive and opportunity to litigate the issue in the manner best suited to furthering those common underlying purposes." *Jones v. Bates*, 127 F.3d 839, 848 (9th Cir. 1997).

To combat the community of interest and sufficiently close elements, Ventilex BV points to an absence of evidence as to:

1.      Commingling of funds or unauthorized diversion or misuse of corporate assets;

2.      Ventilex BV's representation that it would be responsible for Ventilex USA's debts;

3.      Failure of Ventilex BV or Ventilex USA to keep separate corporate documents;

4.      Ventilex BV and Ventilex USA's use of a single address;

5.      Ventilex USA's inadequate capitalization;

6.      Concealment of Ventilex USA's ownership;

7.      Disregard of corporate formalities;

8.      An attempt to assign liabilities to Ventilex USA; and

9.      Use of Ventilex USA as a mere shell or conduit.

The record reveals factual issues whether Ventilex BV and Ventilex USA share a sufficiently close relationship to qualify them as in privity to apply collateral estoppel. Although Ventilex BV is the parent of Ventilex USA, Ventilex BV and Ventilex USA are separate corporations, and there is no evidence to substantiate that Ventilex USA is Ventilex BV's alter ego. Ventilex BV and Ventilex USA's sharing of interests in limited matters at issue is insufficient to cloak them with privity given factual issues regarding their relationship arising from their separate operations. As to the Ventilex System, the record reveals that Ventilex USA was the sales representative and Ventilex BV was the manufacturer and that each had defined, separate roles which at times overlapped. The record reflects that the relationship was typical of a sales representative and manufacturer, except for the parent-subsidiary relationship. Although Paramount Farms raises valid points to support privity, the record raises questions as to the community of interest of Ventilex BV and Ventilex USA to prevent an undisputed finding of privity.

At first blush, Ventilex BV and Ventilex USA's shared legal counsel appears to support privity. However, Ventilex BV raises a valid point that shared counsel "is a matter of judicial and economic efficiency and business judgment." Shared counsel's rigorous representation of Ventilex USA in the arbitration does not translate to privity.

Reasonable Expectations

Paramount Farms argues that Ventilex BV reasonably should have expected to be bound by the arbitration decision. Ventilex BV responds that "[t]here is no evidence of any acquiescence whatsoever by Ventilex B.V. to the arbitration or its result."

To address the reasonable expectations issue, courts examine whether:

1.      The nonparty "had received actual notice at the time of the litigation that his interests were being litigated";

2.      The nonparty "'had in reality contested the prior action even if he did not make a formal

23

appearance,' such as where the nonparty had a financial interest in and 'power to control' the litigation of the prior action"; and

3.    The "unsuccessful party in the first action could 'fairly be treated as acting in a representative' capacity for the nonparty now being precluded."

*Jones*, 127 F.3d at 846 (citations omitted).

The record and its reasonable inferences fail to indicate that Ventilex BV reasonably should have expected to be bound by the arbitration decision.  Ventilex BV was aware of the arbitration but fought to exclude itself from it.  Although Ventilex BV would expect to benefit had Ventilex USA succeeded in arbitration, there is no showing that Ventilex BV had a true financial interest in the arbitration's outcome given remaining questions as to Ventilex BV's liability under the approval guarantee.  Ventilex BV's power to control the arbitration's outcome was limited to participation in it.  Since it did not participate in the arbitration, it lacked control over it.  Ventilex USA did not adequately represent Ventilex BV's interests in the arbitration given that their bases of liability differ in respects.

In sum, factual issues prevent subjecting Ventilex BV to res judicata or collateral estoppel effects of the arbitration decision.

## Agency

Putting aside res judicata/collateral estoppel, Paramount Farms argues that Ventilex USA acted as Ventilex BV's agent to bind Ventilex BV to the arbitration decision under the doctrines of ratification and representative services.

Ventilex BV responds that general corporation principles bar its liability under agency.  "It is a general principle of corporate law deeply "ingrained in our economic and legal systems" that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."  *U.S. v. Bestfoods*, 524 U.S. 51, 61, 118 S.Ct. 1876 (2003).  "The law allows corporations to organize for the purpose of isolating liability of related corporate entities. . . . Only in unusual circumstances will the law permit a parent corporation to be held either directly or indirectly liable for the acts of its subsidiary."  *Bowoto v. Chevron Texaco Corp.*, 312 F.Supp.2d 1229, 1234 (N.D. Cal. 2004).

"Whether to hold a parent liable for the acts of its subsidiary is a highly fact-specific inquiry."

24

1    *Bowoto*, 312 F.Supp.2d at 1234. "There are no inflexible tests by which courts determine when to hold

2    corporations liable for the acts of their subsidiaries. Generally, the corporate separateness is respected

3    unless to do so would work an injustice upon innocent third parties." *Fidelity & Deposit Co. of*

4    *Maryland v. USAFORM Hail Pool, Inc.*, 523 F.2d 744, 758 (5th Cir.1975). But each case must be

5    considered on its own facts." *Edwin K. Williams & Co. v. Edwin K. Williams*, 542 F.2d 1053, 1063 (9th

6    Cir.1976), *cert. den.* 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977).

7                                        ***Ratification***

8          "An agency may be created, and an authority may be conferred, by a precedent authorization or

9    a subsequent modification." Cal. Civ. Code, § 2307. "Ratification is the voluntary election by a person

10   to adopt in some manner as his own an act which was purportedly done on his behalf by another person,

11   the effect of which, as to some or all persons, is to treat the act as if originally authorized by him."

12   *Rakestraw v. Rodrigues*, 8 Cal.3d 67, 73, 104 Cal.Rptr. 57 (1972).

13         Paramount Farms notes that ratification may be inferred from a purported principal's conduct

14   which demonstrates an intent to adopt an act as its own, including acceptance of benefits.  The nature

15   of ratification was explained in *Rakestraw,* 8 Cal.3d 67, 73, 104 Cal.Rptr. 57: "A purported agent's act

16   may be adopted expressly or it may be adopted by implication based on conduct of the purported

17   principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct

18   which is 'inconsistent with any reasonable intention on his part, other than that he intended approving

19   and adopting it.'"

20         "The principal may become liable for an act he did not originally authorize, if the principal

21   ratifies the act." *Shultz Steel Co. v. Hartford Accident & Indemnity Co.*, 187 Cal.App.3d 513, 519, 231

22   Cal.Rptr. 715 (1986).  "There is no question but that where the rights of third persons depend on his

23   election, the rule is a principal must disaffirm an unauthorized act of his agent within a reasonable time

24   after acquiring knowledge thereof, else his silence may be deemed ratification or acquiescence in order

25   to protect an unsuspecting third party." *Gates v. Bank of America Nat. Trust & Savings Ass'n*, 120

26   Cal.App.2d 571, 576-577, 261 P.2d 545 (1953).

27         Paramount Farms contends that Ventilex BV did not disavow its liability under the approval

28   guarantee and affirmed the approval guarantee by "undertaking measures to obtain TERP approval."

                                              25

1   Paramount Farms points to Ventilex BV Managing Director Mr. Dijkman's knowledge that Paramount

2   Farms relied on the approval guarantee to purchase the Ventilex System.  Paramount Farms contends

3   that Ventilex BV "pushed so hard for validation . . . because it felt responsible under the guarantee."

4        The import of Paramount Farms' agency and ratification arguments is unclear.  Paramount Farms

5   appears to claim that Ventilex BV is liable for the arbitration award against Ventilex USA as principal

6   of Ventilex USA because it ratified Ventilex USA's conduct.  Paramount Farms' complaint does not

7   seek to hold Ventilex BV liable specifically as a principal.  The complaint merely includes a routine

8   allegation that "each Defendant was the agent, alter ego, conspirator, and aidor and abettor of the other

9   Defendants."  The complaint clearly states that "Ventilex USA is not a party to this action."  An issue

10   arises whether Paramount Farms' agency theory has been plead and is properly before this Court given

11   the complaint's direct liability claims against Ventilex BV.

12        In addition, Paramount Farms is unclear as to what Ventilex BV ratified.  Paramount Farms

13   appears to claim that Ventilex BV ratified the approval guarantee.  However, based in part on the

14   disarray of the documents forming the agreement between Paramount Farms and Ventilex USA, the

15   scope of Ventilex BV's liability under the approval guarantee is unclear to raise factual issues as to its

16   direct liability let alone its liability under agency or ratification theories.

17        Ventilex BV contends that its liability vis a vis its direct transaction with Ventilex USA is limited

18   by the Ventilex USA General Terms and Conditions' remedy of return of purchase price plus 15 percent.

19   Of key importance is Mr. Dijkman's testimony:

20        Q.    . . . Did you at all times understand that your Ventilex B.V. guarantee was limited
              to return of the purchase price plus no more than 15 percent?

21                  . . .

22        A.    The guarantee says the machine should perform and validate – let validate the
              machine.

23

24        Q.    And if it failed to perform, you understood that you would – you could be
              responsible for return of the purchase price, plus up to 15 percent of the purchase
              price.

25

26        A.    I was pleased to do that.

              . . .

27

28        Q.    . . . Did Ventilex B.V. ever authorize Ventilex U.S.A., Inc. to give a greater

1    warranty than what was in the Orgaline Terms and Conditions[18] that governed its
     dealings with Ventilex U.S.A.?

2

3    A.    We did not give them – we did not give them the authority.

          . . .
4

5    We did give a warranty . . . getting the T.E.R.P. approval. . . . We were not giving them
     unlimited liability.  It was – it was – to my opinion, it was limited to the Orgaline
     Conditions.
6

7    Q.    And the Orgaline Condition limitation also applied to the other warranty or
          guarantee that you're referring to in terms of T.E.R.P. approvals, is that right?

8    A.    Yes, that's – I think so, yeah. . . . I'm always the understanding Orgaline, if you
          limit something, it's for everything.

9

10        At a minimum, the record raises factual issues as to what Ventilex BV "ratified" to defeat

11   summary judgment for Paramount Farms on a ratification theory.

12                          ***Representative Services Doctrine***

13        Paramount Farms argues that Ventilex BV is liable under the approval guarantee pursuant to the

14   representative services doctrine.  Ventilex BV challenges application of the representative services

15   doctrine the "roots" of which "are in the context of personal jurisdiction, not on the ultimate issue of

16   whether liability can attach based on agency principles."

17        "A parent corporation can be held vicariously liable for the acts of a subsidiary corporation if

18   an agency relationship exists between the parent and the subsidiary." *Bowoto,* 312 F.Supp.2d at 1238

19   (N.D. Cal. 2004).   "Unlike liability under the alter-ego or veil-piercing test, agency liability does not

20   require the court to disregard the corporate form. Agency has been a theory on which courts in this

21   circuit have allowed plaintiffs to proceed for many decades." *Bowoto*, 312 F.Supp.2d at 1238.

22        Factors to address a parent corporation's agency liability include "whether the subsidiary is

23   functioning as an incorporated arm of the parent," and  "whether the subsidiary is involved in activities

24   that, but for the subsidiary's presence, the parent would be forced to undertake itself." *Bowoto*, 312

25   F.Supp.2d at 1239. "In addition to the need for a close relationship or domination between the parent

26   and subsidiary, agency liability also requires a finding that the injury allegedly inflicted by the

27   _____

28        [18]     The parties refer to the Ventilex USA Terms and Conditions as the "Orgaline Terms and Conditions."

subsidiary, for which the parent is being held liable, was within the scope of the subsidiary's authority as an agent." *Bowoto*, 312 F.Supp.2d at 1239.

"The agency test is satisfied by a showing that the subsidiary functions as the parent corporation's representative in that it performs services that are 'sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Doe v. Unocal Corp.*, 248 F.3d 915, 928 (9th Cir. 2001) (quoting *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1405 (9th Cir. 1994)).

Paramount Farms characterizes Ventilex USA as "nothing more than Ventilex BV's sales and marketing conduit in North America" and as a "substitute" for Ventilex BV.  Paramount Farms notes that at the time of the Proposal Contract, "Ventilex USA did not develop or manufacture any products" and "merely effectuated sales" by "communicating the details of those sales to Ventilex BV for specific manufacture and ultimate delivery."  Paramount Farms further notes that "in most cases," Ventilex BV was not paid by Ventilex USA until the customer paid Ventilex USA.  Paramount Farms points out that prior to Ventilex USA's incorporation, Ventilex BV sales representatives performed Ventilex USA's current functions.  Paramount Farms notes Mr. Dijkman's dual director status with Ventilex BV and Ventilex USA as "probative" whether an agency exists between Ventilex BV and Ventilex USA.

To establish agency, Ventilex BV holds Paramount Farms to demonstrate:

1. Ventilex BV's "manifestation" that Ventilex USA would act on Ventilex BV's behalf;

2. Ventilex USA accepted or consented to so act; and

3. An understanding that Ventilex BV would control Ventilex USA's undertaking on Ventilex BV's behalf.

To negate support in Paramount Farms' favor on these issues, Ventilex BV notes that:

1. Paramount Farms' Mr. Tremaine concedes he never had discussions with anyone from Ventilex BV;

2. Mr. Dijkman's denial of involvement in negotiations with Paramount Farms although Mr. Schroeder apprised him of developments;

3. Ventilex USA negotiates its own contracts;

4. Ventilex USA is a Delaware corporation with its own board of directors;

28

1        5.       Ventilex USA was established to serve the United States market;

2        6.       Ventilex USA sells products other than those of Ventilex BV;

3        7.       Ventilex USA and Ventilex BV have neither shared banking accounts nor commingled

4                  funds;

5        8.       Ventilex USA and Ventilex BV maintained separate offices and websites; and

6        9.       Ventilex USA and Ventilex BV do not share employees.

7    Ventilex BV further notes that in his declaration, Mr. Schroeder explained:

8        When Ventilex USA contracted to purchase equipment from Ventilex B.V., it always
    remained obligated to pay Ventilex B.V. regardless of whether Ventilex USA's

9        customers actually paid for the equipment.  Of course, in an effort to maintain adequate
    cash flow, I would always seek to pay Ventilex B.V. after Ventilex USA received

10       payment from its customer.

11   Ventilex BV concludes that the evidence suggests "a typical parent-subsidiary relationship with

12   appropriate corporate separateness."

13       The record raises factual issues as to the nature of Ventilex BV and Ventilex USA's relationship

14   to bar summary judgment on the representative services issue in Paramount Farms' favor.  Factual issues

15   arise whether Ventilex USA was a mere sales arm of Ventilex BV in that, among other things, Ventilex

16   BV and Ventilex USA entered into a transaction apart from Paramount Farms for Ventilex USA's

17   acquisition of the Ventilex System and its resale to Paramount Farms.  Although the businesses of

18   Ventilex BV and Ventilex USA intertwined, there is insufficient showing of a close relationship or

19   domination to impose agency liability upon Ventilex BV given the distinct separateness of Ventilex BV

20   and Ventilex USA as demonstrated by Ventilex BV's above points.  Paramount Farms fails to

21   demonstrate application of the representative services doctrine or any other agency theory to support

22   summary judgment in its favor.

23                         **Ventilex BV's Direct Liability**

24       In addition, Paramount Farms argues that Ventilex BV is directly liable under the approval

25   guarantee which is part of the "contract" with Paramount Farms and which neither Ventilex BV nor

26   Ventilex USA fulfilled.  Paramount Farms contends that it "need only show that Ventilex BV authorized

27   or otherwise intended to provide" the approval guarantee to Paramount Farms to prove that Ventilex BV

28   breached the contract and warranty.  Paramount Farms points to Mr. Dijkman's testimony that Ventilex

BV guaranteed governmental approval and a commitment to help to obtain approval and that Mr. Dijkman understood that Ventilex BV and Ventilex USA guaranteed that Paramount Farms would get necessary approvals:

> Q. So to make the sale, Ventilex B.V. and Ventilex, Inc. guaranteed Paramount that the machine it was buying would get the necessary T.E.R.P. approval?
>
> A. Yes.

As noted above, although the reasonable inferences indicate that Ventilex BV is a party to the approval guarantee, the scope of Ventilex BV's liability and Paramount Farms' remedies as to Ventilex BV under the approval guarantee are unclear to bar summary judgment, and Paramount Farms provides no guidance on this matter. Paramount Farms asks this Court to grant it a wholesale summary judgment without explanation how to effectuate such a judgment.

## VENTILEX BV'S SUMMARY JUDGMENT MOTION

### Absence Of Privity

Ventilex BV seeks summary judgment that Paramount Farms' claims of breach of contract, breach of express warranty and breach of implied covenant of good faith and fair dealing fail in the absence of Ventilex BV's privity with Paramount Farms. Paramount Farms responds that Ventilex BV is a contract party because Ventilex BV manufactured and shipped the Ventilex System pursuant to the Proposal Contract and provided the approval guarantee.

### *Absence Of A Contract*

Ventilex BV claims an absence of a contract between it and Paramount Farms to support privity in that:

1. The Proposal Contract lists and was signed only by Ventilex USA and Paramount Farms;

2. The Proposal Contract's notice provision references only Ventilex USA and Paramount Farms;

3. Former Ventilex USA President Mr. Schroeder testified that he had "authority" only for Ventilex USA;

4. Paramount Farms' point person Mr. Tremaine neither had discussions with anyone from Ventilex BV nor asked Ventilex BV to sign the Proposal Contract or to guarantee its

1    terms; and

2    5.    Ventilex BV Managing Director Mr. Dijkman testified that Mr. Schroeder drafted the

3          Proposal Contract, that Mr. Dijkman did not authorize anyone to make a representation

4          or agreement with Paramount Farms for Ventilex BV, that no one from Paramount Farms

5          asked Ventilex BV to sign the Proposal Contract or to guarantee Ventilex USA's

6          performance, and that Mr. Dijkman had no contact with Paramount Farms.

7    Paramount Farms responds that Ventilex BV "directly issued the performance guarantee stating

8    that the machine would achieve governmental approval."   Paramount Farms notes that the approval

9    guarantee "carefully distinguishes between and includes references to Ventilex USA, Ventilex BV, and

10   'VENTILEX' (the combined companies)."

11                                          ***Absence Of Agency***

12   Ventilex BV claims the absence of an agency relationship with Ventilex USA to subject Ventilex

13   BV to vicarious liability.  Paramount Farms responds that there is "ample evidence" that Mr. Schroeder

14   and in turn Ventilex USA acted as actual or ostensible agents of Ventilex BV.

15   An "agent" represents a "principal" "in dealings with third persons.  Such representation is called

16   agency." Cal. Civ. Code, § 2295.  "An agency is either actual or ostensible." Cal. Civ. Code, § 2298.

17   "An agency is actual when the agent is really employed by the principal." Cal. Civ. Code, § 2299. "An

18   agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person

19   to believe another to be his agent who is not really employed by him." Cal. Civ. Code, § 2300.

20   In *Tomerlin v. Canadian Indem. Co.*, 61 Cal.2d 638, 643-644, 39 Cal.Rptr. 731 (1964), the

21   California Supreme Court explained:

22          Actual authority arises as a consequence of conduct of the principal which causes
     an agent reasonably to believe that the principal consents to the agent's execution of an
23   act on behalf of the principal. . . . Similarly, ostensible authority arises as a result of
     conduct of the principal which causes the third party reasonably to believe that the agent
24   possesses the authority to act on the principal's behalf. . . .

25          To establish actual or ostensible authority the principal's consent need not be
     express. "Agency may be implied from the facts of a particular case, and if a principal
26   by his acts has led others to believe that he has conferred authority upon an agent, he
     cannot be heard to assert, as against third parties who have relied thereon in good faith,
27   that he did not intend to confer such power . . . . An agent's authority may be proved by
     circumstantial evidence. . . ." (Citations omitted.)

28

                                                  31

1    For ostensible agency, "the principal need not have been in direct contact with the third party;

2    the manifestation of the principal may be to the community at large, and may consist of appointing the

3    agent to a particular position." *Meyer v. Ford Motor Co.*, 275 Cal.App.2d 90, 102, 79 Cal.Rptr. 816

4    (1969).

5    Ventilex BV argues "there is no factual basis" to find actual agency in that the Proposal Contract

6    is between Paramount Farms and Ventilex USA and Mr. Schroeder lacked "authority to bind Ventilex

7    B.V. to any contract."   Ventilex BV continues that Ventilex USA lacks ostensible authority in the

8    absence of Ventilex BV's conduct to cause "a third party reasonably to believe" that Ventilex USA has

9    authority.   Ventilex BV points to Mr. Tremaine's testimony of the absence of his discussions with

10   Ventilex BV personnel.  Ventilex BV holds Paramount Farms to establish that Paramount Farms' belief

11   that Ventilex USA's authority to bind Ventilex BV was reasonable in that "persons dealing with an

12   assumed agent are bound at their peril to ascertain the extent of the agent's authority." *Lindsay-Field*

13   *v. Friendly*, 36 Cal.App.4th 1728, 1734, 43 Cal.Rptr.2d 71 (1995).

14   Ventilex BV contends that it lacks a sufficient "unity of interest and ownership" with Ventilex

15   USA "to obliterate their separate corporate personalities."   As a reminder, a general principle of

16   corporate law is "that a parent corporation (so-called because of control through ownership of another

17   corporation's stock) is not liable for the acts of its subsidiaries." *Bestfoods*, 524 U.S. at 61, 118 S.Ct.

18   1876.  Ventilex BV further argues that Paramount Farms could not reasonably believe "that a separate

19   foreign parent corporation would be bound under these circumstances" in the absence of Ventilex BV's

20   extensive control over Ventilex USA to create an agency relationship.   To support the absence of

21   Ventilex BV's control over Ventilex USA, Ventilex BV notes that:

22        1.    Ventilex USA is a Delaware corporation with its own board of directors;

23        2.    Ventilex USA was established as a separate corporation to serve the United States

24              market;

25        3.    Ventilex USA manufactures products and sells third-party products;

26        4.    Ventilex BV neither negotiates nor executes contracts for Ventilex USA;

27        5.    Ventilex BV did not authorize Ventilex USA to enter into the Proposal Contract;

28        6.    Ventilex BV and Ventilex USA do not share employees; and

32

7.    Ventilex USA placed purchase orders with Ventilex BV which issued invoices to Ventilex USA.

To oppose Ventilex BV's points, Paramount Farms points to communications between Paramount Farms' Mr. Tremaine and Ventilex USA's Mr. Schroeder and in turn Mr. Schroeder's communications with Ventilex BV personnel addressing negotiations. Paramount Farms gleams from the exchange of communications that Ventilex BV was aware to the approval guarantee and accepted it as to the Ventilex System sold to Paramount Farms in the absence of attempt to remove the approval guarantee. Paramount Farms argues that Mr. Schroeder "informed Ventilex BV every step of the way of the negotiated terms of the agreement," including the approval guarantee. Paramount Farms concludes that Ventilex BV's silence in receiving and failing to disclaim the approval guarantee binds it to the approval guarantee.

With the parties' legal points and contentions in mind, this Court turns to the viability of Paramount Farms claims for breach of contract, breach of express warranty and breach of implied covenant of good faith and fair dealing.

### Breach Of Contract

"The standard elements of a claim for breach of contract are: '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff therefrom.'" *Wall Street Network, Ltd. v. New York Times Co.*, 164 Cal.App.4th 1171, 1178, 80 Cal.Rptr.3d 6 (2008). Ventilex BV argues that the first element requires "a valid contract *between the parties*" to avoid liability for "entities that are not parties to a contract." *Gen-Probe Inc. v. Center for Neurologic Study,* 853 F.Supp. 1215, 1219 (S.D. Cal. 1993) (counterclaim dismissed for failure to allege "existence of a written contract" between the parties).

Paramount Farms points out that "a person who holds himself out as offering a service cannot complain if in reliance thereon another accepts the offer and agrees to the terms. Such a person becomes a party without being a signator." *Huckell v. Matranga*, 99 Cal.App.3d 471, 481, 160 Cal.Rptr. 177 (1979).

Ventilex BV argues that since it is neither a signatory nor party to the Proposal Contract, Paramount Farms lacks a "viable claim of agency or vicarious liability" or a "cognizable theory upon

1   which Ventilex B.V. can be held liable" on the Proposal Contract.

2        The key problem for Ventilex BV is the approval guarantee in the November 8 letter, which

3   states: "VENTILEX USA Inc. and VENTILEX B.V. hereby certifies [sic] that the equipment that we

4   supply will be accepted by the FDA and USDA for the Pasteurization of Almonds."  The approval

5   guarantee continues that "VENTILEX will work hand in hand with Paramount Farms to make sure that

6   the 'system' is accepted and 'validated.'" The approval guarantee also provides: "VENTILEX guarantees

7   the VENTILEX equipment will be validated and will correct any item found to be deficient at our cost."

8   Page four of the of the November 8 letter's specifications reveals that the system was shipped from

9   Ventilex BV's overseas plant ("F.O.B.: VENTILEX B.V., Heerde, The Netherlands").

10       The November 8 letter with its approval guarantee put Ventilex BV front and center to certify

11  and validate the Ventilex System.  Mr. Dijkman confirmed that the Ventilex System sale to Paramount

12  Farms was premised on Ventilex BV's approval guarantee which Mr. Schroder recalls was prepared by

13  Ventilex BV.  The approval guarantee, November 8 letter and specifications treat Ventilex BV and

14  Ventilex USA as a combined entity to raise factual issues as to the scope of Ventilex BV's responsibility

15  under the approval guarantee and remedies available for Ventilex BV's breach of the approval guarantee.

16  The Proposal Contract and November 8 letter reveal that Ventilex BV, at a minimum, offered services

17  which Paramount Farms accepted despite whether Ventilex BV signed the Proposal Contract.  The

18  evidence, viewed most favorably to Paramount Farms, indicates that Ventilex BV made the approval

19  guarantee and took no measures to disavow it, especially given that it appeared in connection with two

20  other Ventilex System sales.  Ventilex BV's attempt to raise agency defenses are unavailing given

21  Ventilex BV's affirmative actions to make the approval guarantee and absence of actions to disavow it.

22  Paramount Farms' breach of contract claim survives.

23                          **Breach of Express Warranty**

24       Breach of express warranty elements include "the exact terms of the warranty, plaintiff's

25  reasonable reliance thereon, and a breach of that warranty which proximately causes plaintiff injury."

26  *Williams v. Beechnut Nutrition Corp.*, 185 Cal.App.3d 135, 142, 229 Cal.Rptr. 605 (1986); *see Burr v.*

27  *Sherwin Williams Co.,* 42 Cal.2d 682, 268 P.2d 1041 (1954).

28       Ventilex BV challenges the breach of express warranty claim in that Ventilex  BV was not a

1  party to the Proposal Contract and the alleged breach of express warranty relates solely to the Proposal

2  Contract.

3       Paramount Farms notes the absence of privity requirement with an express warranty. "Privity

4  is generally not required for liability on an express warranty because it is deemed fair to impose

5  responsibility on one who makes affirmative claims as to the merits of the product, upon which the

6  remote consumer presumably relies." *Cardinal Health 301, Inc. v. Tyco Electronics Corp.*, 169

7  Cal.App.4th 116, 143-144, 87 Cal.Rptr.3d 5 (2008). Paramount Farms argues that at a minimum,

8  "Ventilex BV conferred agent status upon Mr. Schroeder by receiving, reviewing, and accepting the draft

9  contract that contained the guarantee."

10      This Court is not prepared to conclude that Ventilex BV did not provide the approval guarantee

11  to Paramount Farms and in turn is not subject to the approval guarantee. Ventilex BV is plainly named

12  in the paragraph providing the approval guarantee's certification that the equipment "will be accepted

13  by the FDA and USDA." Mr. Dijkman acknowledged Ventilex BV's approval guarantee to Paramount

14  Farms. The approval guarantee creates no less than a factual issue that Ventilex BV provided an express

15  warranty of acceptance by FDA and USDA. Ventilex BV's attempt to disavow its attachment to the

16  certification and approval guarantee is unpersuasive. The breach of express warranty claim survives

17  Ventilex BV's lack of privity attack.

18      **Breach Of Implied Covenant Of Good Faith And Fair Dealing**

19      Ventilex BV likewise challenges the breach of implied covenant of good faith and fair dealing

20  claim in its absence as a party to the Proposal Contract.

21      "There is an implied covenant of good faith and fair dealing in every contract that neither party

22  will do anything which will injure the right of the other to receive the benefits of the agreement."

23  *Kransco v. American Empire Surplus Lines Ins. Co.*, 23 Cal.4th 390, 400, 97 Cal.Rptr.2d 151 (2000)

24  (quoting *Comunale v. Traders & General Ins. Co.,* 50 Cal.2d 654, 658, 328 P.2d 198 (1958)). "The

25  prerequisite for any action for breach of the implied covenant of good faith and fair dealing is the

26  existence of a contractual relationship between the parties, since the covenant is an implied term in the

27  contract." *Smith v. City and County of San Francisco*, 225 Cal.App.3d 38, 49, 275 Cal.Rptr. 17 (1990).

28  "Without a contractual relationship, [a plaintiff] cannot state a cause of action for breach of the implied

35

1   covenant." *Smith*, 225 Cal.App.3d at 49, 275 Cal.Rptr. 17; *see Waller v. Truck Ins. Exchange, Inc.*, 11

2   Cal.4th 1, 36, 44 Cal.Rptr.2d 370 (1995) *("*there can be no action for breach of the implied covenant of

3   good faith and fair dealing because the covenant is based on the contractual relationship").

4          Paramount Farms offers no meaningful defense for survival of the breach of implied covenant

5   of good faith and fair dealing claim.  Paramount Farms neither explains how Ventilex BV breached the

6   implied covenant nor offers facts to support a breach.  Given that the arbitration panel found that such

7   claim failed as to Ventilex USA, this Court is hard pressed, without Paramount Farms' assistance, to

8   determine viability of the claim as to Ventilex BV.  Ventilex BV is entitled to summary adjudication on

9   the breach of implied covenant of good faith and fair dealing claim.

10                   **Breach Of Implied Warranties Of Merchantability**

11                      **And Fitness For Particular Purpose**

12          Ventilex BV argues that Paramount Farms' claims of breach of implied warranties of

13   merchantability and fitness for particular purpose fail because Paramount Farms cannot establish

14   "vertical privity" with Ventilex BV.  Paramount Farms responds that Ventilex BV was a party to the

15   contract with Paramount Farms and that direct contractual privity is not required for a breach of implied

16   warranty claim.

17          "Vertical privity is a prerequisite in California for recovery on a theory of breach of the implied

18   warranties of fitness and merchantability." *U.S. Roofing, Inc. v. Credit Alliance Corp.*, 228 Cal.App.3d

19   1431, 1441, 279 Cal.Rptr. 533 (1991).  A California plaintiff alleging breach of warranty must stand in

20   "vertical privity" with the defendant. *Anunziato v. eMachines, Inc.*, 402 F.Supp.2d 1133, 1141 (C.D.

21   Cal. 2005).  The California Court of Appeal has explained "vertical privity":

22          "The term 'vertical privity' refers to links in the chain of distribution of goods. If the
             buyer and seller occupy adjoining links in the chain, they are in vertical privity with each
23          other and lack of privity would not be available as a defense to the seller in a warranty
             action brought by the buyer. For example, the distributor is normally in vertical privity
24          with the manufacturer, and the ultimate retail buyer is normally in vertical privity with
             the dealer. But if the retail buyer seeks warranty recovery against a manufacturer with
25          whom he has no direct contractual nexus, the manufacturer would seek insulation via the
             vertical privity defense." (Clark & Smith, The Law of Product Warranties (1984) ¶
26          10.01[1], p. 10-3.)

27   *Osborne v. Subaru of America, Inc.,* 198 Cal.App.3d 646, 656, n. 6, 243 Cal.Rptr. 815 (1988).

28          "[T]here is no privity between the original seller and a subsequent purchaser who is in no way

                                                    36

1  a party to the original sale." *Burr*, 42 Cal.2d at 695, 268 P.2d 1041.  Stated another way, an "end

2  consumer" who "buys from a retailer is not in privity with a manufacturer." *Clemens v.*

3  *DaimlerChrysler Corp.,* 534 F.3d 1017, 1023 (9th Cir. 2008).

4      Ventilex BV argues that Paramount Farms is unable to establish vertical privity with it because

5  the Proposal Contract establishes that Paramount Farms contracted for the Ventilex System with

6  Ventilex USA, not Ventilex BV.  Ventilex BV contends that the breach of implied warranty claims fail

7  in the absence of Paramount Farms' privity with manufacturer Ventilex BV.

8      Paramount Farms responds that Ventilex BV ignores the "many dealings" between Paramount

9  Farms and Mr. Schroeder, "Ventilex BV's representative," and the approval guarantee.  Paramount

10 Farms claims that Ventilex BV's direct dealings with Paramount Farms avoid the privity requirement.

11     The evidence, viewed in Paramount Farms' favor, reveals a direct contractual nexus with

12 Ventilex BV given the approval guarantee that "the equipment we supply will be accepted by the FDA

13 and USDA for the Pasteurization of Almonds."  Mr. Dijkman establishes that Ventilex BV was aware

14 of Paramount Farms' need for an almond pasteurizer that would secure governmental approvals.  The

15 evidence and inferences favorable to Paramount Farms point to direct links in the distribution chain to

16 Ventilex BV given that Trecom, a Ventilex BV subcontractor, installed the Ventilex System at

17 Paramount Farms and performs commissioning and start ups for Ventilex BV machines.  Moreover, the

18 evidence does not suggest that Ventilex BV merely sold the Ventilex System to Ventilex USA and

19 washed its hands of ensuing matters.  The reasonable inferences from the evidence suggest that Ventilex

20 BV remained involved after its sale and assisted to attempt to secure governmental approvals to satisfy

21 the approval guarantee.  As such, the record raises factual issues as to vertical privity to prevent

22 summary judgment in Ventilex BV's favor on the breach of implied warranty claims.

23                                      **Warranty Limitations Period**

24     Ventilex BV contends that one-year warranty limitations in the Proposal Contract and the

25 Paramount Standard Conditions bar all of Paramount Farms' claims.  Paramount Farms responds that

26 the approval guarantee is not subject to time limitations addressing workmanship and materials.

27     The Proposal Contract's section "7.  Warranty" provides: "The Contractor warrants that all the

28 equipment covered by this quotation will be free of defects due to workmanship and materials for a

37

1   period of <u>12 months</u> from start up."  (Underlining in original.)

2        The Paramount Standard Conditions' section "15. Contractor's Guarantee" provides: (d) Except

3   as otherwise provided in this Contract, the guarantees and warranties shall remain in effect for one year

4   after the completion of the project."

5        Ventilex BV claims these warranties expired no later than mid-June 2007 prior to Paramount

6   Farms' indication that its was dissatisfied with the Ventilex System.  Ventilex BV contends that the

7   warranty period started no later than June 29, 2006 when Ventilex System installation was completed

8   and that Ventilex BV learned of potential problems no earlier than September 2007.  Ventilex BV points

9   out:  "If a manufacturer determines that useful life [of a product] and warrants the product for a lesser

10  period of time, we can hardly say that the warranty is implicated when the item fails after the warranty

11  period expires.  The product has performed as expressly warranted."  *Clemens*, 534 F.3d at 1023.

12       Paramount Farms responds that the approval guarantee lacks a time limitation.  Paramount Farms

13  points to Mr. Dijkman's testimony as to the significance of warranty time limits: "Warranty time is

14  mostly on mechanical parts and I'm not sure it's applicable for warranty on process.  I'm not so sure.

15  It's mostly warranties – you know, machines wear and tear and we have to guarantee it and faults and

16  everything."  Paramount Farms continues that "this case is and has always been about obtaining

17  governmental approval," not defects in materials or workmanship.  Paramount Farms contends that the

18  Ventilex System was "defectively designed" to render the warranty limits inapplicable to the approval

19  guarantee.

20       This Court agrees with Paramount Farms.  The approval guarantee is separate from warranties

21  on materials and workmanship.  Ventilex BV points to no express time limit that applies to the open-

22  ended approval guarantee.  Subjecting the approval guarantee to a time limit suggested by Ventilex BV

23  would render the approval guarantee useless given that government approval was never secured.  The

24  Proposal Contract and Paramount Standard Conditions' warranty time limits are inapplicable to

25  Paramount Farms' claims.

26                      **Ventilex USA General Terms And Conditions**

27       Ventilex BV argues that the Ventilex USA General Terms and Conditions governed the sale of

28  the Ventilex System from Ventilex BV to Ventilex USA and that Ventilex BV "never authorized the

resale of its equipment" in the absence of the Ventilex USA General Terms and Conditions to bar or substantially limit Paramount Farms' claims.

Ventilex BV relies on section 23 of the Ventilex USA General Terms and Conditions, which provides: "The Supplier's liability is limited to defects, which appear within a period of one year from delivery.  If the daily use of the Product exceeds that which is agreed, this period shall be reduced proportionately." Ventilex BV claims that no defect appeared within one year of delivery of the Ventilex System.

Ventilex BV also relies on section 33 of the Ventilex USA General Terms and Conditions which provides:

> Where the defect has not been successfully remedied . . .
>
> a) the Purchaser is entitled to a reduction of the purchase price in proportion to the reduced value of the Product, provided that under no circumstance shall such reduction exceed 15 percent of the purchase price, or
>
> b) where the defect is so substantial as to significantly deprive the Purchaser of the benefit of the contract, the Purchaser may terminate the contract by notice in writing to the Supplier.  The Purchaser is then entitled to compensation for the loss he has suffered up to a maximum of 15 percent of the purchase price.

Ventilex BV argues that it "unequivocally limited recoverable damages to the return of the purchase price, plus no more than 15% of purchase price, and thus cannot be liable for damages in excess of that amount."

Ventilex BV also points to a section 43 of the Ventilex USA General Terms and Conditions. However, the language that Ventilex BV attributes to the section 43 differs substantially from the exhibit Ventilex represents as the Ventilex USA General Terms and Conditions.

Paramount Farms argues that the Ventilex USA General Terms and Conditions were not subject to an agreement with Paramount Farms.  Paramount Farms argues that Ventilex BV's attempt to incorporate the Ventilex USA General Terms and Conditions by reference fails to satisfy incorporation by reference requirements.

In *Shaw v. Regents of University of California*, 58 Cal.App.4th 44, 54, 67 Cal.Rptr.2d 850 (2008), the California Court of Appeal explained incorporation by reference requirements:

> "A contract may validly include the provisions of a document not physically a

part of the basic contract. . . . 'It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document. . . . But each case must turn on its facts. . . . For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties.' " (Citations omitted.)

Ventilex BV's reliance on the Ventilex USA General Terms and Conditions is misplaced.  The evidence reveals that the Ventilex USA General Terms and Conditions were not part of the agreement with Paramount Farms in that they were neither referred to in the Proposal Contract nor attached to the version of the Proposal Contract signed by Paramount Farms and Ventilex USA.  As such, purported reference to the Ventilex USA General Terms was unclear and, at best for Ventilex BV, equivocal. Paramount Farms denies that it agreed to the Ventilex USA General Terms and Conditions to no less than raise a factual issue as to their application and whether the Ventilex USA General Terms and Conditions were called to Paramount Farms' attention.  As the arbitration panel found, there is no evidence that Mr. Tremaine or any one else from Paramount Farms understood that the Ventilex USA General Terms and Conditions applied.  Like the arbitration panel, this Court concludes that the Ventilex USA General Terms and Conditions do not apply despite Ventilex BV's claims that Ventilex USA provided them to Paramount Farms during negotiations weeks prior to the signing of the Proposal Contract.  In the absence of Paramount Farms' consent, the Ventilex USA General Terms and Conditions do not apply to Paramount Farms.  Moreover, the portions of the Ventilex USA General Terms and Conditions upon which Ventilex BV relies do not address governmental approvals to render such portions irrelevant and no less than superceded by the approval guarantee's express language.

**Paramount Farms' Overhead Damages Claim**

Ventilex Farms seeks summary adjudication on Paramount Farms' claim of $2,565,000 overhead damages for efforts to address the Ventilex System problems.

In his report, Paramount Farms accountant expert Edward White ("Mr. White") opined that Paramount Farms "has incurred substantial overhead costs and has lost significant executive and managerial time which was focused on finding and implementing a solution to the problems created by the Ventilex failures." Mr. White calculated Paramount Farms' total overhead related to almonds during November 2005 to March 2009 was $25,650,000.  Mr. White opined that 10 percent of the almond

1   overhead ($2,565,000) was allocated to "[a]cquiring, installing, testing and modifying the Ventilex unit,"

2   "[d]eveloping a solution to the Ventilex failures," "[a]cquiring, installing, and testing the FMC

3   Pasteurizer," and "[m]anaging the outside pasteurization."  The premise of Mr. White's opinion is that

4   Paramount Farms' management could have devoted efforts to make money if they did not need to

5   address Ventilex System problems.

6        Ventilex BV contends that during his arbitration testimony, Mr. White was unable to identify

7   "overhead costs" (internal labor, salaries, utilities, etc.) that increased due to Ventilex System problems.

8   Ventilex BV argues that Paramount Farms and Mr. White "fail to demonstrate any causal link between

9   issues relating to the Ventilex System and any dreamed up overhead damages."  In sum, Ventilex BV

10  characterizes the overhead damages as "speculative."

11       Paramount Farms characterizes its overhead costs as "lost opportunity costs."  Paramount Farms

12  claims it expended "significant efforts" to arrange for outside pasteurization and to negotiate and

13  purchase the FMC System to avoid a "shut down" of its almond operations.  Paramount Farms argues

14  that the "real test is what percentage of the overhead was dedicated to the disruption caused by

15  Ventilex's failure to provide a product that worked."

16       The "burden of proof is upon the party claiming the damage to prove that he has suffered damage

17  and to prove the elements thereof with reasonable certainty."  *Peters v. Lines*, 275 F.2d 919, 930 (9th Cir.

18  1960).   A plaintiff can recover only "those elements that he can prove with reasonable certainty."

19  *Walden v. United States*, 31 F.Supp.2d 1230, 1235 (S.D. Cal. 1998).

20       Ventilex BV is correct that the overhead damages advocated by Mr. White are speculative and

21  lack sufficient certainty.  This Court agrees with the arbitration panel's analysis:

22       While it appears likely the inability to use the Ventilex pasteurizer did result in some
         increased overhead expense, the Panel is unable to conclude that the method by which
23       it was calculated is sufficiently certain to allow an award.  Mr. White simply took a
         percentage of a percentage, which appears to us to be speculation.
24

25  Like the arbitration panel, this Court is unable to conclude that Mr. White's method supports the

26  overhead damages award sought by Paramount Farms.  Ventilex BV is entitled to summary adjudication

27  on the overhead damages claim.

28  / / /

                                              41

## Paramount Farms' Liquidated Damages Claim

Paramount Farms seeks $5.42 million pursuant to the Proposal Contract's liquidated damages provision ("liquidated damages provision"), which provides in part: "If the work under this Contract is not completed by the deadline set forth in Paragraph 4 of this Proposal Contract . . ., the parties agree that liquidated damages shall be assessed and paid" in increments ranging from $1,000 to $5,000 per day.  Paramount Farms claims that since Paramount Farms never received "a working machine," Paramount Farms is entitled to liquidated damages "from January 27, 2006 until the time [Paramount Farms] obtained TERP validation of the new FMC machine on January 24, 2009."

Ventilex BV argues that the liquidated damages provision "applies only to delays in initial shipping" and points to the Proposal Contract's January 27, 2006 "ship date."  Ventilex BV notes the absence of a "validation date" in the liquidated damages provision and interprets the liquidated damages provision to ensure that the Ventilex System was shipped no later than January 27, 2006.  Ventilex BV points out that the parties resolved a dispute over late shipment of the Ventilex System with a $10,000 credit to Paramount Farms to establish an "understanding" and "satisfaction and accord" of the liquidated damages provision to waive a liquidated damages claim at this stage.  Ventilex BV argues that to the extent the liquidated damages clause is ambiguous, it should be construed against Paramount Farms as drafter and that Paramount Farms' liquidated damages claim fails in the absence of a reasonable relationship to actual anticipated damages.  "A liquidated damages clause will generally be considered unreasonable, and hence unenforceable . . . if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach."  *Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal.4th 970, 977, 73 Cal.Rptr.2d 378 (1998).  Ventilex BV continues that Paramount Farms' attempted recovery of actual and liquidated damages is "an impermissible double recovery."

Paramount Farms contends that the liquidated damages provision applies in that Ventilex BV "never shipped a 'completed' machine or otherwise completed the 'work'" as defined by the Proposal Contract.  Paramount Farms argues that "work" referenced in the liquidated damages provision comprised assembly of a Ventilex System guaranteed to obtain "necessary governmental approvals within a commercially reasonable time" and "shipment of that system by January 27, 2006."

1    Paramount Farms' interpretation of the liquidated damages claim is unreasonable and

2 overreaching in that the liquidated damages provision addresses completion of a Ventilex System

3 capable of obtaining governmental approval or not. The liquidated damages provision's scope is limited

4 to manufacture of the Ventilex System and its shipment. Paramount Farms offers no evidence, and

5 Ventilex BV's evidence negates, that the liquidated damages provision applies to governmental

6 approval. There is no dispute that governmental approval would be sought after the Ventilex System

7 was manufactured, shipped, installed and tested and in turn after the "ship date" noted in the Proposal

8 Contract. The liquidated damages provision does not address failure to satisfy the approval guarantee

9 which Paramount Farms concedes is the core issue. Ventilex BV is correct that Paramount Farms and

10 Ventilex USA addressed the liquidated damages clause shortly after Paramount Farms' receipt of the

11 Ventilex System and that Paramount Farms' liquidated damages claim encroaches on damages

12 recoverable under its other theories. Ventilex BV is entitled to summary adjudication on Paramount

13 Farms' liquidated damages claim.

14                         **CONCLUSION AND ORDER**

15    For the reasons discussed below, this Court:

16    1.    DENIES Paramount Farms summary judgment;

17    2.    GRANTS Ventilex summary adjudication on Paramount Farms' breach of implied

18          covenant of good faith and fair dealing claim and overhead and liquidated damages

19          claims but otherwise DENIES Ventilex BV summary judgment; and

20    3.    CONFIRMS the September 16, 2010 pretrial conference and November 1, 2010 trial.

21    IT IS SO ORDERED.

22 **Dated:    August 23, 2010**            **/s/ Lawrence J. O'Neill**
                                    UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28

                                43